IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LANGDON CARTER, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, | : | |
| Defendant. | : | No. 20-545 |

**MEMORANDUM OPINION**

**Timothy R. Rice**                                                                                   **December 8, 2021**
**U.S. Magistrate Judge**

Plaintiff Langdon Carter alleges that Defendant City of Philadelphia is responsible for the loss of his home and possessions because police assisted in his illegal eviction. See Compl. (doc. 1). He brings claims for: (1) violations of his Fourteenth Amendment right to due process (Count I); (2) violations of his Fourth Amendment right against unfounded search and seizure (Counts II and III); (3) wrongful eviction (Count IV); and (4) conversion (Count V). Id. ¶¶ 37-62. The City seeks summary judgment, and its motion is granted because Carter failed to provide evidence from which a reasonable jury could find the City liable under any of his claims.

**I.      Legal Standard**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence and any inferences from the evidence must be viewed in the light most favorable to the non-moving party. See Ray v. Warren, 626 F.2d 170, 173 (3d Cir. 2010). If reasonable minds could conclude that there are sufficient facts to support a plaintiff's claims, summary judgment should be denied. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment should be granted only if no "reasonable jury could return a verdict for the nonmoving party," based on the evidentiary record. Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010).

A plaintiff may bring a civil rights action under 42 U.S.C. § 1983 against any person who allegedly deprived the plaintiff of his federal constitutional rights while acting pursuant to state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  To prevail on a claim involving a violation of the Fourteenth Amendment right to procedural due process, Carter must show: (1) a protected property interest; and (2) a procedure that did not afford meaningful notice and an opportunity to be heard.  Fuentes v. Shevin, 407 U.S. 67, 80 (1972); Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).  To establish a violation of his Fourth Amendment right against unreasonable "search and seizure," Carter must show his home or person was searched or seized without "probable cause." Carpenter v. United States, 138 S. Ct. 2206, 2213 (2018).  To prove a "wrongful eviction" claim, Carter must show a "wrongful act by the landlord which result[ed] in an interference of [his] possession" of the property.  Pollock v. Morelli, 369 A.2d 458, 460 (Pa. Super. 1976) (citing, inter alia, Minnich v. Kauffman, 108 A. 597 (Pa. 1919) (landlords who interfere with the implied covenant of quiet enjoyment of their tenants are liable for damages)).  Finally, to prove a conversion claim, Carter must show the City deprived him of property without his consent and without "lawful justification" by "an act intended to affect" the property.  Shonberger v. Oswell, 530 A.2d 112, 114 (Pa. Super. 1987)

Carter also must satisfy the legal standard for suing municipalities.[1]  With respect to his constitutional claims, Carter must show that the constitutional violation was the result of an officially adopted policy or well-established custom or practice.  Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 691 (1978).  With respect to his state law claims, Carter must show liability is not precluded by the Political Subdivision Tort Claims Act, 42 Pa. C.S. § 8541 ("Tort

---

[1] In March 2011, Carter dropped his claim against the property owner who carried out the illegal eviction.  See 3/11/21 Notice of Voluntary Dismissal (doc. 8).  He also failed to bring any claims against the individual police officers involved in this dispute.

Claims Act"), which states that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person," with limited exceptions.

## II. Facts Most Favorable to Carter

On the evening of September 25, 2019, Carter was in his home at 2026 North 20th Street in Philadelphia, recovering from a seizure. Def. Mem. Ex. B, Carter Dep., at 65, 106. He had been living there since 2009. Id. at 20. Carter had been a handyman at the building and arranged with the owner to reside rent-free in exchange for maintenance services. Id. After the owner died intestate, Carter applied to participate in Philadelphia's Owner Occupied Property ("OOP") program. Def. Mem. Ex. C (April 2018 Application and Agreement for OOP). As part of that program, Carter agreed to maintain the property, pay back taxes, and record a deed establishing ownership within three years. Id.; see also Pl. Mem. Ex. D (5/18/18 Agreement to pay back taxes on the 20th Street property). Carter complied with his agreement as of September 25, 2019.[2] Carter Dep. at 30, 49 56.

In August 2019, Demetrius Thornton, a relative of the deceased prior owner, sought to name himself the prior owner's sole heir and claim ownership of the property. Compl. ¶ 22. On September 25, 2019, Thornton brought three people with him to evict Carter from the 20th Street property. Carter Dep. at 70. One of the people accompanying Thornton identified himself as a police officer and another identified himself as the property's purchaser. Id. They directed

---

[2] There is some evidence that Carter may have improperly filled out his original OOP paperwork, and that the person he hired to record the deed in his name may have intentionally failed to do so. Compare Carter Dep. at 149 (he paid someone $400 to establish title), with id. at 157-58 ("Mr. Carter was scammed on this issue[.]"). I nonetheless view the facts in the light most favorable to Carter and assume he was in full compliance and properly established a legal interest in the property. Ray, 626 F.2d at 173.

Carter to leave the property immediately because it had been sold. Id. at 66-71; see also Def. Mem. Ex. H (9/26/19 Deed Transfer).

Thornton and several of Carter's neighbors independently called the police. Carter Dep. at 65-67, 96. Police asked Carter for identification and he produced an identification card with a West Ontario Street address, not the address of the 20th Street property. Id. at 60, 83, 93. Police concluded that Carter was a "professional squatter." Id. at 45 (Police told Carter, "Open your mouth, you go [to] jail."). Carter was warned by several police officers that he could never return to the 20th Street property or even re-enter to gather his personal effects. Id. at 101 (officer told Carter he could not go back inside the property to retrieve his shoes), 104-05, 110-11. Carter heard one officer tell another that Carter had a right to produce his documents to prove his ownership of the property, but the first officer was instructed to "cuff him" regardless. Pl. Mem. Ex. L (Interrogatory Answers), Int. 12.

Police handcuffed Carter and put him in a police vehicle. Carter Dep. at 98. Police did not interfere as Thornton and his companions boarded up the 20th Street property, effectively barring Carter's re-entry. Carter Dep. at 98. Police also discovered that Carter was subject to an outstanding out-of-state arrest warrant. Statement of Undisputed Facts (doc. 18-1) ("Undisputed Facts") ¶ 22; see also Def. Mem., Ex. F (9/25/19 Complaint/Incident Report noting "arrest in ref to warrant OCH 10ST061391"). After processing Carter, police released him at 3 a.m. on September 26, 2019. Carter Dep. at 109.

### III. Discussion

The City seeks summary judgment on Carter's constitutional claims because he cannot

4

show his losses were caused by an official policy or custom.[3]  I agree.

To show that his constitutional deprivation was caused by a municipal policy, Carter must identify the "official proclamation, policy, or edict" that was issued by a leader with the authority to do so.  Mulholland v. County of Berks, 706 F.3d 227, 237 (3d Cir. 2013).  To show that his deprivation was caused by a "custom," Carter must identify a practice that is "so permanent and well-settled as to virtually constitute law."  Id.

The parties have identified two relevant policies. The first, Policy Directive 3.17, governs how "police personnel will enforce statutes prohibiting" self-help eviction practices, i.e., "any action or threatened action taken, without legal process, by a landlord or a landlord's agents, which is intended to dispossess a tenant from a dwelling unit or prevents the tenant from lawfully occupying the dwelling unit."  Def. Mem. Ex. I (doc. 17-12) ("Directive 3.17").  Pursuant to Directive 3.17, police officers called to a self-help eviction dispute must: (1) establish the

---

[3]  The City also argues Carter lacks standing to file suit.  Def. Mem. at 5-8.  It contends that the OOP does not create property interests, and that Carter has failed to produce evidence showing the City deprived him of a protected property interest.  Id. at 7 (because Carter "failed to seek and record title . . . there is no basis for him to claim that his OOP[] agreement constituted a legally protected interest in the subject property").  An equitable property interest, however, is sufficient to establish standing.  Matos v. Berks Cty. Tax Claim Bureau, 228 A.3d 976, 980-81 (Pa. Commw. Ct. 2020).  Carter has testified that the prior owner wanted him to own the property after her death, Carter Dep. at 143-44, that he paid off the property's second mortgage, id. at 147, financed improvements to the property, id. at 24, established and paid for the property's utilities, id. at 23-24, 43, and obtained property insurance, Pl. Mem. Ex. J (2018 USAA homeowners insurance policy for the 20th Street property in Carter's name).  A reasonable jury could find this evidence establishes an equitable interest in the property.  Moore v. Keller, 98 A.3d 1, 4 (Pa. Commw. Ct. 2014) (finding appellant who "had been living at the Property for 18 years and had invested substantial sums in capital improvements and had been paying the tax bill," was "an equitable owner of the Property" despite not being named "on the last registered deed to the Property").  The City further argues Carter lacks standing because he cannot establish the City ever took possession of his property.  Def. Mem. at 8.  This ignores, however, Carter's argument that Thornton took his property with "an implicit assist from the police."  Pl. Mem. at 6.  Although I find the City cannot be held liable based on based on Monell and the Tort Claims Act, there is sufficient evidence to establish standing.  Moore, 98 A.3d at 4.

parties' identities; (2) issue to all parties and ask all parties to read the "Tenant's Referral Notice"; (3) require the landlord to produce the "Alias Writ of Possession" and, if the landlord is unable to do so, "[i]nform the tenant that they are entitled to regain possession of the premises immediately"; (4) "[i]nform the landlord to take prompt remedial action to restore access or habitability to the dwelling unit or issue a Non-Traffic Summary Citation"; (5) let the landlord know they need an Alias Writ of Possession from the Municipal Court to go forward with the eviction; (6) "provide stand-by assistance while the tenant regains immediate entry to the dwelling unit"; and (7) "[p]repare a Complaint or Incident Report (75-48) listing all pertinent information and action taken by police." Directive 3.17 at 2-3. If a landlord violates the law against self-help evictions, police must issue a Non-Traffic Summary Citation and prepare a Complaint/Incident Report. Id. at 3.

The other policy, Directive 77, governs police execution of out-of-state warrants. Def. Mem. Ex. G (doc. 17-10). Under Directive 77, police apprehending a fugitive must ensure they have the right person by verifying the arrestee's identity, checking at least the: (1) name; (2) date of birth; (3) physical description; (4) fingerprints; and (5) social security or other identifying number. Directive 77 at 6. Police also must verify that the issuing jurisdiction still seeks the arrest and allow the fugitive to leave after six hours if the other jurisdiction has not responded. Id. at 5. Further, police are required to prepare reports establishing probable cause for the arrest and check for other outstanding warrants. Id. at 5-6.

Due Process

Carter argues the City is liable based on its failure "to adopt and implement a needed lockout enforcement policy better calibrated, and with a greater likelihood of preventing said deprivations." Pl. Mem. at 4. Carter alleges that police should have arrested Thornton at the

scene. Id. at 5. He claims that either the City failed to "adopt and train" officers in a policy that would allow them to arrest landlords who, like Thornton, illegally evict tenants or, if police had the authority to arrest Thornton but chose not to do so, that this constitutes a police "custom" of not arresting landlords pursuing illegal evictions.[4] Id.

There is no dispute that Directive 3.17 outlines the steps the police should follow when responding to a self-help eviction. Although the evidence, viewed in the light most favorable to Carter, shows that the police did not abide by those steps in responding to Thornton's eviction of Carter,[5] it is insufficient to show that the police had a custom of not following Directive 3.17 when responding to evictions.

Municipalities can be held liable when their "failure to train" employees constitutes a custom that demonstrates "deliberate indifference." City of Canton, Ohio v. Harris, 489 U.S. 378, 387 (1989) ("if a concededly valid policy is unconstitutionally applied by a municipal

---

[4] In his Complaint, Carter alleges the City conspired to deprive him of his due process rights. Compl. ¶¶ 37-42. However, he makes no argument to support this assertion. See generally, Pl. Mem. He has produced no evidence from which a reasonable jury could find that the police, some of whom were by his own account summoned by his neighbors to protect his interests, agreed with Thornton to deprive him of due process. Carter Dep. at 95 (police were called by Thornton and multiple neighbors). Moreover, as explained, infra, he has failed to produce evidence of a "separate underlying intentional or criminal act that can support a civil conspiracy claim" since "[s]trict liability and negligence counts are insufficient to support [] civil conspiracy claim[s]." Goldstein v. Phillip Morris, Inc., 854 A.2d 585, 590 (Pa. Super. 2004).

[5] Viewing the facts in the light most favorable to Carter, the police did not permit Carter to go back into the premises to produce documentation showing he was entitled to live at the 20th Street property once they saw his identification card with another address. Carter Dep. at 60. The police also did not require Carter and Thornton to read the Tenant's Referral Notice. Although the police stated in their Incident Report that they informed Thornton that he needed an Alias Writ of Possession from the Municipal Court to go forward with the eviction, they did not tell Thornton or Carter that Carter had the right to re-enter the premises. Def. Mem. Ex. E (Incident Report stating Thornton was advised to obtain an Eviction Notice when he complained Carter refused to leave his property). The police did not issue a Summary Citation when they saw Thornton blocking Carter's re-entry to the property and even assisted in keeping him out. Finally, the police were specifically authorized to "provide stand-by assistance while [Carter] regain[ed] immediate entry to the dwelling unit" but failed to do so. Directive 3.17 at 3.

employee, the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train"). To succeed on a failure to train claim, however, Carter must produce evidence that the municipal employees lacked appropriate training. See, e.g., id. at 382 (noting that failure to train claim was supported by testimony that "shift commanders were not provided with any special training"). Perhaps discovery may have uncovered evidence of a practice or custom of deviating from Directive 3.17, as police did here, but Carter has failed to present it.

Instead, he argues that Directive 3.17 is insufficient because it does not specifically authorize the police to arrest landlords who continue to pursue an illegal eviction, rendering police "powerless to prevent" his loss. Id. at 9. He fails, however, to show that such a specific authorization is necessary if the police otherwise comply with the safeguards of Directive 3.17. He also concedes that nothing in Pennsylvania law prevents the police from arresting landlords pursuing an illegal eviction. Pl. Br. at 8.

Although Carter has produced evidence that unidentified and uncharged officers may have failed to fully comply with departmental policy in Directive 3.17, he has failed to produce sufficient evidence that, viewed in the light most favorable to him, would permit a reasonable jury to conclude that he suffered a constitutional deprivation caused by the City's policies, practices, or customs. Monell, 436 U.S. at 691; Canton, 489 U.S. at 387.

Search and Seizure

Carter also claims that police conducted an illegal search and seizure when they entered the vestibule of his home (Count II) and arrested him (Count III). Compl. ¶¶ 43-52.

Carter has disputed the City's assertion that officers never entered his home, stating they entered its vestibule. Statement of Disputed Facts (doc. 22-1) ¶ 19. The deposition transcript he

cites, however, fails to support his claim. Carter testified that Thornton entered the vestibule. Carter Dep. at 90. When asked whether uniformed officers entered his home, Carter answered "no." Id. at 91. Moreover, Carter also testified that, when he argued to the police that he could prove he was the property's owner because his belongings were inside, they refused to enter and verify his statements. Id. at 81 ("My mail [wa]s right here at the door in the mailbox but they didn't want to come in."). I grant judgment to the City on Count II because Carter has produced no evidence from which a reasonable jury could conclude that police entered the home.

The City is also entitled to judgment on Count III because the out-of-state warrant provided probable cause for Carter's arrest. United States v. White, 75 F. App'x 894, 896–97 (3d Cir. 2003) (a valid warrant provides probable cause for arrest). Carter does not dispute that he was arrested on an outstanding warrant, nor does he challenge the warrant's validity. Undisputed Facts ¶ 22. Thus, he cannot show he was arrested without probable cause. See Holmes v. McGuigan, 184 F. App'x 149, 151 (3d Cir. 2006) (affirming summary judgment against plaintiff who had been arrested "after a computerized database and a conversation with his dispatcher informed [police] of an outstanding warrant" despite plaintiff's mistaken belief that "the warrant had already been 'taken care of'" when plaintiff "produced no evidence that would tend to undermine the warrant's validity.").[6]

    Wrongful Eviction and Conversion

Carter contends that his wrongful eviction was perpetrated with "an implicit assist" from

---

[6] The City also argues Carter has failed to establish an equal protection claim, noting that he has not produced evidence showing he was treated differently than other similarly situated persons. Def. Mem. at 10 (citing, inter alia, Brown v. Borough of Mahaffey, 35 F.3d 846, 850 (3d Cir. 1994)). Although I agree, I find that Carter never brought an equal protection claim. See Compl. ¶¶37-64 (averring claims based on due process (I), search and seizure (II and III), wrongful eviction (IV), and conversion (V)).

police.  Pl. Mem. at 6.  He fails to explain, however, how his state law claims fit into one of the limited exceptions to the Tort Claims Act's restrictions on municipal liability.  Pennsylvania allows municipal liability only when damages would be available against a private individual, 42 Pa. C.S. § 8542(a)(1), the municipal actor was negligent, id. § 8542(a)(2), and, with respect to damage or loss of real or personal property, the property was "in the possession or control of the local agency," id. §§ 8542(b)(2), 8542(b)(3).[7]

Carter testified that Thornton, not the police, stole his real property and barred access to his personal property.  Carter Dep. at 98 (Thornton and the buyer boarded up the home), 103-04, 166 (police took only his "pride" but made it possible for others to take his belongings).  Carter has failed to produce evidence from which a reasonable jury could find his state law claims against the City exempted from the state law restrictions on municipal liability.[8]

An appropriate order follows.

---

[7] Although the Tort Claims Act denies immunity to employees of local agencies for their intentional torts, it does not strip immunity from the municipality itself.  Cooper v. City of Chester, 810 F. Supp. 618, 626 (E.D. Pa. 1992) (citing, inter alia, Marko v. Philadelphia, 576 A.2d 1193, 1193 (Pa. Commw. 1990), app. granted, 592 A.2d 46 (Pa. 1991); King v. Breach, 540 A.2d 976, 979 (Pa. Commw. 1988); Deluca v. Whitemarsh Township, 526 A.2d 456, 457 (Pa. Commw. 1987); Miller v. Emelson, 520 A.2d 913, 915 (Pa. Commw. 1987); Steiner v. Pittsburgh, 509 A.2d 1368, 1369–70 (Pa. Commw. 1986); Dudosh v. Allentown, 629 F. Supp. 849, 856 (E.D.Pa.1985); Kuchka v. Kile, 634 F. Supp. 502, 513 (M.D. Pa.1985); Paul v. John Wanamakers, Inc., 593 F. Supp. 219, 222–23 (E.D. Pa.1984)).

[8] The City also argues Carter cannot show it is liable for wrongful eviction because it cannot show a landlord-tenant relationship between the two parties.  Def. Mem. at 16.  It is unclear, however, whether a wrongful eviction claim, which is based on the implied covenant of quiet enjoyment between landlord and tenant, could be based on something akin to a tortious interference with contract claim.  See Maier v. Maretti, 671 A.2d 701, 707 (Pa. Super. 1995) (noting that "one who intentionally and improperly interferes with the performance of a contract between another and a third person by causing the third person not to perform the contract is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract").  Because Carter has failed to show his claims fall within exceptions to the Tort Claims Act, I need not determine whether a wrongful eviction claim can be pursued on a tortious interference theory.